FILED
2021 Sep-23  AM 10:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **SURKANO EDWARDS,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:19-CV-2101-CLM** |
| | ) | |
| **NORFOLK SOUTHERN** | ) | |
| **RAILWAY COMPANY, INC.,** | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Surkano 'Tank' Edwards ("Edwards"), a 51-year-old black male, sues his employer Norfolk Southern Railway Company ("NSRC") for discriminating against him because of his age and race. For the reasons stated below, the court **GRANTS** NSRC's motion for summary judgment on all claims (doc. 30).

### Factual Background

NSRC operates a rail line that runs above several rivers. This case revolves around NSRC's draw bridge over the Warrior River in Eutaw, where Edwards has worked as a drawbridge tender—*i.e.*, the person who sits in a tall tower and communicates with boats, barges, and trains to make sure they don't collide—since 2001. To better explain Edwards' claims, the court must first explain why bridge tenders are treated differently than other NSRC employees who work at the bridge.

### A. The CBA

Edwards began working his current stint with NSRC in 2001.[1] After his two-month probationary period, Edwards joined the Brotherhood of Maintenance Way Employees union. Edwards is still a union member.

NSRC has a collective bargaining agreement ("CBA") with the Union. The CBA covers many things, including job classifications, work assignments, wage rates, and benefits like mileage and meal allowances. The CBA gives NRSC the right to control and direct its employee's daily job duties, and it gives employees the right to file a grievance if they believe NRSC has misinterpreted or violated its terms.

### B. The Line of Progression

Gang-based positions have a typical line of progression: apprentice first, then helper, then mechanic. With each step comes a raise. Bridge tenders are not gang-based positions, so they fall outside the line of progression. The following chart shows the progression and relevant differences in pay:

| Gang-based positions | | Non-gang position | |
|---|---|---|---|
| Apprentice | $28.13/hr. | $28.54/hr. | Bridge Tender |
| Helper | $28.64/hr. | | |
| Mechanic | $30.07/hr. | | |

---

[1] Edwards worked for NRSC from 1998 to 2000, when NRSC terminated him for fighting with a coworker. NRSC rehired Edwards in February 2001.

Gang-based employees may also be entitled to mileage and meal allowances if they have to travel, while bridge tenders have no right to mileage and meal allowances if they are assigned a particular bridge.

The CBA allows NRSC to temporarily assign employees in one category to fill the duties of another, as long as NRSC pays the employee his hour rate plus any benefits. Relevant here, that means NRSC can use mechanics and helpers to work as bridge tenders, as long as NRSC pays the mechanics and helpers the relatively higher wages and benefits they are entitled to under the CBA.

### C. Edwards' move to bridge tender

Edwards returned as a helper in February 2001, meaning that he was in the gang-based line of progression. Eight months later, Edwards successfully bid on an open bridge tender position, which took him out of the gang. The parties disagree why. NRSC says it was voluntary, as the CBA would not allow NRSC to force the move and Edwards never filed a grievance claiming that he was forced to move.

Edwards says he wasn't given a choice. Edwards testified that after he was rehired, but before he started work back on the gang (as a helper), assistant division engineer Roy Carlisle called Edwards to his office. Edwards claims that in that meeting, Carlisle and Edwards' direct supervisor, Jim Stoker, told Edwards "that they didn't want me back out there on the gang; that there was going to be a draw

tender position open, and when it comes open, you're going to bid on it." (Doc. 31-1 at 17). So he did. Because Edwards is the non-movant here, the court must accept this version as true. That means the court assumes (without finding) that Edwards did not want to move to the bridge tender position in October 2001.

Rather than chronologically detail all the facts that Edwards claims prove discrimination here—because doing so would be confusing—the court breaks them up into their appropriate claims and categories in the Analysis section. For now, it's enough to say that Edwards' complaints fall into two main categories: (1) Younger white employees who were categorized as helpers and mechanics made more money and got more benefits than Edwards when NRSC assigned them to work bridge tender duties and (2) NRSC prevented Edwards from choosing to work more bridge tender shifts to avoid paying him overtime, even though he was the bridge tender with the most seniority.

## STANDARD OF REVIEW

1. <u>Rule 56</u>: Summary judgment is proper when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P.* 56(a). A material fact generally "affect[s] the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court must consider all evidence in the

record when deciding whether to grant a motion for summary judgment. *Tippens v. Celotex Corp.*, 805 F.2d 949, 952 (11th Cir. 1986). The court does not weigh this evidence but decides whether a genuine issue of material fact exists. *Anderson*, 477 U.S. at 249. If a "reasonable jury could return a verdict for the nonmoving party," the District Court should not grant summary judgment. *Id.* at 248. That said, the plaintiff must show more than "the mere existence of a scintilla of evidence" to prove a genuine dispute exists that would prevent summary judgment. *Id.* at 252. In a discrimination case, the court can grant summary judgment if a plaintiff has not satisfied an element of the prima facie case. *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1433 (11th Cir. 1998).

2. <u>Race Discrimination</u>: Courts use the three-step *McDonnell Douglas* framework to judge race discrimination claims under Title VII and 42 U.S.C. § 1981. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Cooper v. Georgia Dep't of Transp.,* 837 F. App'x 657, 666-68 (11th Cir. 2020). In step one, the plaintiff must prove a prima facie case by showing that (1) he was a member of a protected class, (2) he was qualified, (3) the defendant subjected him to an adverse employment action, and (4) the defendant took that action because of his race. If the plaintiff meets that burden, then in step two, the defendant must provide a facially race-neutral reason for taking the adverse action. If the defendant produces a race-

neutral reason, then in step three, the plaintiff must prove the defendant's reason is pretextual and that race was the real reason.

3. <u>Age discrimination</u>: Courts use the same three-step *McDonnell Douglas* framework to judge claims of age discrimination under the ADEA, except the plaintiff must show that age—not race—was the reason the defendant took the adverse action against him.[2]

## ANALYSIS

The court has struggled to parse Edwards' original complaint (doc. 1), which Edwards never amended and NRSC never moved to dismiss or to seek a more definitive statement. The complaint contains six counts, but the titles to Counts 1 and 4 are identical, the titles to Counts 2 and 5 are identical, and the titles to Counts 3 and 6 are identical (except Count 6 is missing a forward slash):

| | |
|---|---|
| Count One—ADEA Failure to Promote/Disparate Treatment in Pay | Count Four—ADEA Failure to Promote/Disparate Treatment in Pay |
| Count Two—Title VII—Race Discrimination—Failure to Promote/Disparate Pay | Count Five—Title VII—Race Discrimination—Failure to Promote/Disparate Pay |
| Count Three—42 U.S.C. § 1981 Race Discrimination—Failure to Promote/Disparate Treatment in Pay | Count Six—42 U.S.C. § 1981 Race Discrimination—Failure to Promote Disparate Treatment in Pay |

---

[2] Plaintiffs that cannot make a prima face case under *McDonnel Douglas* may rely alternatively on the presentation of "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." *Sims v. MVM, Inc.*, 704 F.3d 1327, 1334 (11th Cir. 2013). But Edwards does not present a convincing mosaic theory in his opposition; he relies instead on *McDonnell Douglas*. Doc. 33. So the court finds that Edwards has waived the argument.

Doc. 1 ¶¶ 35-81. As best the court can tell, Edwards copied the allegations in Count 1 and pasted them into Count 4 (minus a few lines about failure to promote to "lead draw tender"), then did the same with Counts 2 and 5 and Counts 3 and 6 respectively, *id.*, without explaining the differences between them (if any).

Nor do the individual counts contain individual claims. For example, Count 1 contains a complaint about the denial of overtime (¶37), a complaint about lower pay (¶¶38-39), a complaint about the failure to promote to lead draw tender (¶40-41), and a complaint about the failure to promote to mechanic (¶42). Then, Count 2 puts a failure to promote claim and a failure to provide overtime claim in the same sentence (¶47) but attaches neither to a similarly situated employee (¶¶44-50). Count 2 then concludes with the statement that "Defendant's actions in not promoting/hiring Plaintiff were a violation of Title VII," even though the complaint does not allege that NRSC failed to hire Edwards. (It did, twice.)

So rather than address Edwards' complaint count-by-count, the court tries to read Edwards' complaint in line with the arguments the parties make in their Rule 56 briefing. *See* Docs. 32, 33, 34. The court reminds both parties that Rules 8 (pleading standards), 12 (defenses and objections), and 15 (amendments) should be used to correct these pleading issues before the case is presented to the court and/or a jury for decision.

### A. Failure to Promote to Lead Bridge Tender or Mechanic

Edwards alleged in Counts 1-3 that NRSC failed to promote him to "the lead draw-tender position" or "to the same level as his co-workers" (*i.e.*, mechanic) because of his age and his race. Doc. 1 ¶¶ 40-42 (age), 46-48 (race), 52-55 (race).

But it is undisputed that "there is no specific position at the bridge classified as 'Senior' or 'Lead Draw Tender,'" (docs 32, 33, Undisputed Fact #37) and "[Edwards] has never bid on any other vacant jobs at NSRC since he began working as a bridge tender" (*id.* Undisputed Fact #9). NSRC argues that these facts prove that "there is not a 'failure to promote' claim as alleged in the Complaint" (doc. 32 at 18), and Edwards failed to respond to this argument in his opposition brief.

So the court finds that Edwards has abandoned his failure to promote claims under the ADEA, Title VII, and § 1981. The court also finds that, even if Edwards had not abandoned the claims, no reasonable juror could find that NSRC failed to promote Edwards to a non-existent position (lead bridge tender) or to a position for which he did not apply (mechanic).

### B. Discrimination in Pay Rates and Benefits

Edwards alleges that NSRC discriminated against him by paying him less per hour ($28.54) to perform bridge tender duties than it pays younger white employees Dustin Lake ($30.07), Matthew Mitchell ($30.07), and Harrison ($28.64), who also

receive mileage and meal benefits that Edwards doesn't. Doc. 33 at 22-23. The court

explains the facts behind this claim before analyzing its merits.

    1. The Facts: NRSC operates the bridge 24 hours a day. To do so, it uses four

employees to work alone as bridge tenders on 12-hour shifts. One group member

runs the day shift from 6:00am to 6:00pm, then another runs the night shift from

6:00pm to 6:00am. Every four days, the groups rotate. These employees currently

tender the bridge:

|  | Group A | Group B |
|---|---|---|
| Day Shift | Surkano Edwards<br>Bridge Tender ($28.54) | Matthew Mitchell<br>Mechanic ($30.07) |
| Night Shift | Dustin Lake<br>Mechanic ($30.07) | James Harrison<br>Helper ($28.64) |

As you can see, Edwards is the only one of the four who NSRC classifies as a bridge

tender. The other three are employed in the gang-based line of progression. Mitchell,

a mechanic, was lowest in seniority when he was asked in 2010 to perform tender

duties. Lake was at the bottom of the list in 2016, when he replaced another mechanic

who was suspended while performing the shift. Harrison, a helper, replaced another

mechanic (John Hartfield) in 2020.

Even though Mitchell, Lake, and Harrison are working as bridge tenders during their shifts, the CBA requires HSRC to pay their mechanic and helper rates plus benefits (mileage and meals), thus the difference in pay and benefits among the four. Edwards makes the least.

2. *McDonnell Douglas*, Step One: The court finds that Edwards cannot make a prima facie case of race or age discrimination in Step One because he cannot identify a similarly situated white or younger employee. The Eleventh Circuit requires that, to prove discrimination because of race or age, plaintiffs must name comparators who are "similarly situated in all material respects" other than race or age. *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1224 (11th Cir. 2019) (en banc). Here, none of the three comparators are similarly situated to Edwards in their position with NSRC. All three are in the gang-based line of progression, so the CBA requires NSRC to pay them differently than NSRC pays Edwards, who works outside the line of progression. Because each comparator has a material distinction from Edwards that is not based on race or age, no reasonable juror could find that Edwards could prove a prima facie case of discrimination.

3. *McDonnell Douglas*, Step Three: Even if Edwards could make a prima facie case, he could not prove pretext in Step Three.

NSRC has a facially race-neutral and age-neutral reason for paying Mitchell, Lake, and Harrison differently than Edwards: The CBA *requires* NSRC to. Edwards admits this is true (doc. 33, Undisputed Fact #81), so he can't attack NSRC's reason head-on. Instead, he launches collateral attacks.

First, Edwards argues that NSRC could have avoided the CBA-mandated pay disparities by making different business decisions. For example, Edwards argues that NSRC could have abolished the mechanic position (thus reducing Mitchell and Lake's pay), or it could have hired external replacements as bridge tenders (rather than using internal transfers), or it could have sought a Letter of Agreement from the Union that would have remedied the disparity among positions. *See* Doc. 33 at 26-32. Edwards argues that NSRC chose to instead use internal transfers so that NSRC could discriminate against an older black employee.

The court rejects this pretext argument for two reasons. First, complying with a CBA—rather than trying to skirt it—is a reasonable business decision, and courts do not second-guess the reasonable business decisions of an employer. *See Chapman v. Al Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc) ("Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason"). Second, an older white

employee, Gilbert Norwood, worked alongside Edwards as a bridge tender until he retired in July 2018. Norwood made the same complaint to NSRC that Edwards makes here, and NSRC "explained to ***both Norwood and [Edwards]*** that nothing could be done to increase their pay to the mechanic pay rate because the CBA set the pay rate for bridge tenders." (Docs. 32, 33, Undisputed Facts #90-93) (emphasis added). If NSRC cited the CBA to refuse giving a higher pay rate to Edwards and a similarly-situated older white employee, then no reasonable juror could find that complying with the CBA was merely pretext to discriminate against Edwards because of his race or age.

Edwards' second argument is that Carlisle forced him to bid for an open bridge tender position in 2001, but no one forced Lake, Mitchell, or Harrison to transfer out of their gang-based, line of progression positions years later. But this doesn't prove pretext for two reasons. First, it doesn't explain away NSRC's similar treatment of Norwood (an older white male) until his retirement in 2018. Second, it is too remote in time. For 20 years, Edwards never complained to NSRC or the Union that he was forced to bid on the bridge tender job because was black or older (or for any reason). Nor does he raise that stand-alone claim here. And even if Carlisle forced Edwards to change positions for nefarious reasons in 2001, that's not evidence that NSRC made race-based or age-based discriminatory decisions a

decade or more later—particularly when Carlisle retired in 2012.[3]

* * *

In sum, Edwards fails to show that a similarly situated younger employee and/or white employee received preferable pay rates and benefits, and he fails to show that NSRC's adherence to the CBA was merely pretext to discriminate against him because of his race or age. So the court will dismiss all counts that allege discrimination based on different pay rates and benefits among persons who perform bridge tender duties on the same bridge as Edwards.

## C. Discrimination in Overtime Assignments

Finally, Edwards argues that NSRC discriminated against him because of his race (not age) when NSRC took away overtime opportunities that arose after Norwood, the older white bridge tender, retired in 2018. Doc. 32 at 33-35. The court explains the facts behind this claim before analyzing its merits.

1. The Facts: The court previously explained how NSRC used four employees to tend the bridge—i.e., two groups of two men, working 12-hour shifts, four days on, then four days off. NSRC gives the senior-most team member first choice of shifts, including any extra shifts or overtime if someone had to miss time. But no one could can to work back-to-back 12-hour shifts.

---

[3] NSRC didn't assign a mechanic to bridge tender duties until 2010—i.e., nine years after Edwards bid for an open bridge tender position.

Norwood was the senior member of the four-man team until he retired in 2018. NSRC advertised his position, but no one bid. NSRC then tried two mechanics, who turned down the assignment. So NSRC tended the bridge with three people: Edwards, Lake, and Steve Mitchell.

Edwards, who became the senior-most bridge tender when Norwood retired, asked bridge supervisor Alan Taylor to leave only three employees tending the bridge so that they could work more shifts to earn more money and overtime. But Lake complained to Taylor that he was working too many consecutive days without enough rest because Edwards (who had first pick) was choosing the shifts that Edwards wanted. Taylor recounted the conversation like this at his deposition:

> Anyway, Dustin [Lake] called me and said, man, he said, I can't take no more of this. He said, I'm not getting my proper rest. He said, you know, Tank [Edwards] is picking and choosing.
>
> He's the senior man, he always gets—Tank is the senior man; vacation, he picks everything. It has always been that way. Seniority rules.
>
> But the trouble we had was Dustin [Lake] was working like fourteen straight days. Tank wanted the money and, you know, they agreed to work it.
>
> But what I'm saying is, Dustin was working like the days that Tank didn't want to work, and Dustin was working like fourteen or fifteen straight days. So Dustin called me and told me, he said, I can't do it. So it ran into a safety issue because Dustin is not getting the proper rest.

Doc. 31-8 at 44-45. To avoid a safety issue, Taylor brought in a fourth member,

mechanic John Hartfield, who had recently tended the bridge when Mitchell was temporarily suspended. Hartfield's position allowed him to work anywhere in the Southwest region. While members of the four-man team have since changed, four men have tended the bridge ever since.

2. *McDonnell Douglas*, Step One: The court finds that Edwards cannot prove a prima facie case in step one because he cannot identify a similarly situated white employee who was treated more favorably.

Edwards argues that Taylor (and thus NSRC) discriminated against him when Taylor added a fourth member back to the team, thereby taking away Edwards' ability to choose which morning shifts he wanted to take. Doc. 33 at 34-35. Edwards argues that Norwood, his white predecessor, took the shifts he wanted without a similar impediment. *Id.* at 34.

But Norwood is not similarly-situated to Edwards in a material respect—*i.e.*, Norwood never served on a three-man team. Norwood always served on a four-man team, which made it easier to accommodate his requests. So no evidence shows that NSRC treated Norwood better than Edwards when both worked on a three-man team. And Edwards does not dispute that "[a]s the senior most employee, like Norwood, [Edwards] gets first choice on when he wants to work, including any extra shifts or overtime" now that the bridge is tended by four men. (Docs. 32, 33,

Undisputed Fact #39). So in the time period that Edwards has been similarly situated to Norwood, Edwards admits that NSRC has treated them equally. And NSRC treated Edwards the same as his white colleagues Lake and Mitchell, who had also been benefiting from the extra hours bestowed by a three-man rotation.

Because NSRC treated Edwards the same as his white colleagues when they were similarly-situated in all material respects, Edwards cannot prove a prima facie case of race discrimination.

3. *McDonnell Douglas*, Step Three: Even if Edwards could prove a prima facie case, he cannot prove that NSRC's race-neutral reason for adding a fourth man to the team—*i.e.*, to ensure safety at the bridge—is merely a pretext to take hours away from Edwards because he is black. Here is what Taylor testified about the decision:

> So we brought Hartsfield back up because, you know, Lord forbid—say if Dustin were to fool around there and pick that bridge up in front of a train or something, it would have been a major catastrophe down there, and we had not done what we could to make sure that man got his rest, we would have been liable for it. So we didn't have no other choice but to bring John back.

> So that puts them back on a four-day twelve-hour rotation, which they still get eight hours of sleep.

Doc. 33-8 at 46.

Again, plaintiffs cannot prove pretext by second-guessing the wisdom of a reasonable business decision. *See Chapman*, 229 F.3d at 1030. And the court finds reasonable NSRC's decision to place the safety of those on the river and its tracks above its employees' ability to work more shifts to make more money. So the court will grant NSRC's motion to dismiss all counts about racial discrimination in the distribution of overtime hours.

* * *

NSRC also argues that all of Edwards' claims are precluded by the Railway Labor Act, 45 U.S.C. § 151, *et seq.*, and that some of Edwards' claims are time barred. Doc. 32 at 33-35. But the court needn't address these arguments because no reasonable juror could find that any of Edwards' claims entitles him to relief. So the court refrains from commenting on NSRC's remaining arguments.

## CONCLUSION

For the reasons stated above, NSRC's motion for summary judgment (doc. 30) is due to be **GRANTED** on all counts. This court will enter a separate order that does so.

**DONE** on September 23, 2021.

_____
**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE

17